United States of America. Arguments not to exceed 15 minutes per side, which 15 minutes for the plaintiff and 15 minutes will be shared by the defendants. And Mr. Horan may proceed for the appellant. Good morning, Your Honors. My name is Jeff Horan. I'm here representing Mark Zanecki as personal representative of his father's estate. I have asked to reserve three minutes for rebuttal before I begin. I suppose it's too late at this point to delegate to a law student. So I'll just take a shot at this. This case is one we believe of first impression. We don't know of another case that's asked and decided the question whether or not. You mean bringing it under the Federal Tort Claims Act? Yes, whether a Medicare Advantage organization is an employee of the United States for purposes of that statute. There is a well-defined body of law following Logue that talks about what test one applies in reaching the determination whether or not an entity is an employee or an independent contractor. You're dropping your voice a little bit, at least to this side of the bench. All right. I'll try and speak up here. Thank you. And the question has always turned on day-to-day physical control. And it seems from our perspective that with a public program of the size and scope of Medicare and with the advent of the HMO model that the notion of direct physical control on a day-to-day basis is hardly apt. We've certainly argued in our brief that the nature of the regulations affecting this organization, the nature of the contract and the contractual requirements result in control above and beyond what one typically finds. Would we not, in effect, take the state courts completely out of the medical malpractice business if we buy your argument? No, I don't think so. Well, I'm thinking about the universal health care and all of these plans, particularly for people that reach that magic age. I don't believe what we're asking the court to do, to define HAP to be an employee and not an independent contractor in the statute. I don't believe that that necessarily nor universally involves cases where the dispute is going to be whether or not the care itself breached a standard of care. In other words, I think there will be a separate role and continue to be a separate role for state law medical malpractice cases. The facts in this case involve the approval of a procedure under very unusual circumstances that resulted in an experimental device, not even in clinical trials yet, being inserted into the head of a man who later died from it. And the process by which that service was provided under Medicare is a uniquely federal question. Well, I mean, it would have been provided, say, even if there was not Medicare. I mean, the procedure there. Plaintiffs disagree with that assertion. And the reliance is on the marketplace, to be honest with you. Had Mr. Zinnecke been a younger man, had he been insured by Blue Cross or Aetna, someone would have sought approval for this procedure, and a private insurer would have said, no, we're not paying for this device. It's available only in limited humanitarian circumstances. You don't have that. This won't occur. In fact, it would not have occurred under a more traditional model of Medicare Part A or B because there, too, the market would have said we can't get paid. It's only in the Medicare. I'm sorry, you have a question. No, no. Your client was getting better, and somebody at the hospital decided they wanted to try this, right? It was not a Medicare-developed technique. It was developed out there in the medical community somewhere. Either some physician or some pharmaceutical house or somebody developed this procedure, and they tried it on him. He was the wrong person to try it on. Okay. He didn't need it. Is that right? Not only did he not need it, but it shouldn't have been tried on anyone other than under limited humanitarian exceptions. But the fact that Medicare approved it is your link under the Federal Court Claims Act. Is that right? That's correct. So if he didn't have insurance and they did it, there wouldn't be a Federal Court Claim, right? It's only because it's going to be paid for by a medical insurance program. Correct. Okay. Let me ask you a question that I ask guardedly because it does take our focus away from the Federal Court Claims sort of standing question. But I'm just curious about this. Let's assume that we were to say that there was sufficient control to make the HAP, or whatever this is, a government employee. Under the Federal Court Claims Act, all that really is doing is incorporating state tort law and applying it to the government. So where was the duty here that the people that approve the payment of these things, where does that give rise to a duty to the patient that seems to me comes from the doctor, not the medical plan? Do you have a case that says that there would be liability if you could get under the Federal Court Claims Act? The complaint alleges a range of duties. I know what the complaint says. It's what's like that thick. A bound volume, I understand. Right. So is there a case or cases that I could look for, just to satisfy my insatiable curiosity here, that suggests that even if it's under the Federal Court Claims Act, any of these duties that are alleged in the complaint actually exist on the part of the payor? Both the payor and the doctor and the hospital, all of those, everyone in the process, frankly, in the case of experimental devices is subject to regulatory control by institutional review boards. I don't have a case, but I would submit that. This would also be a case of first impression as to whether you could even win on liability, either the duty to warn or the simple fact of having approved the paying for the procedure. All right. So, all right. You answered the question. We're looking for a duty at a minimum under those regulations and the requirements that you comply with the IRB rules when using experimental devices. HAP in this instance, as we say as an employee and agent of the government, did not access a program called InterQual, which actually, if you enter the procedure, would have popped up data saying this is not approved. It shouldn't happen. So, we have what we think is a duty, and we think kind of reaches there. So, you have this duty then. Aren't you ending up transforming Part C into what essentially what we have with Part A and Part B, which is exactly, it seems to me, it's exactly contrary to what Congress was trying to do when they created these medical advantage programs under Part C? Weren't they trying to offload the risk to somebody else? I think they were trying to offload budgeting risk, to be certain, by seeking a capitated per patient monthly flat fee with certain adjustments for the risk of the population being served and the area where service is being provided. They were certainly seeking to offload financial risk and seek budget stability. I think it's ironic that the magistrate held that under Parts A and B, you would more likely, those intermediaries have been held and would more likely be an employee because they're controlling the purse strings. But they're also controlling, through the market, the health care decisions because a hospital and a doctor who's not going to get paid for a procedure under Part A or B is unlikely to perform it, knowing that payment approval will not be forthcoming. What Part C does is combine those behind a capitated fee wall, and suddenly the HMOs of the world are making not only financial decisions, but in a very real way medical care decisions when they're approving things like this particular procedure. Why does that make them not an independent contractor but an employee of the federal government? I think the nature of the control in the contract and the regulations is designed to speak to choice in a way that, more typically, regulations and contracts don't. More typically under the statute, we're dealing with someone who's maintaining a building for a government or perhaps operating facility, even a prison or a jail. But those programs don't involve choice by consumers and by millions of consumers who are now being told you have Option A and you have Option B. Behind Option B is a whole range of risks, and I think that because that choice is being made, because participants have the right to make a choice, the government has inserted itself both by contract and by regulation in a more substantial and a more meaningful way, particularly when it comes to marketing. You don't market which prison you're going to go to. You're sentenced to a prison. You don't market, come to our courthouse, GSA has contracted with someone to polish the floors. But with something as personal as your health care choice in Medicare, the government is taking greater control with those marketing materials, and it's one of our arguments. Listen, if the government means this business that national care directives are a floor, not a ceiling, and that somehow experimental care is this bonus service that Part C providers can provide if they want to, there ought to be some warning about that. The communication between Part C providers directly supervised by the government is aimed at providing information about what does it mean if you choose to go Part C, if you enter door number two. It seems like there's less supervision if Part C says to the provider, here's so many dollars per patient per year that we're giving you, and you can decide what kind of care you want to give to the people. Contrasting to Parts A and B, there's not control prior to the delivery of services. In this sense, there's more control because of the nature of marketing and other things that put the Part C provider in advance of care and insert the Medicare authority in advance of the receipt of care, and that doesn't happen under Part A and Part B. We would argue the opposite, looking only at the purse strings and saying that Part A and P providers are contractors, but then saying because there's a capitated fee makes a Part C provider somehow less controlled. It seems to get it backwards to me that we are now entrusting folks at the Medicare provider to make critical care decisions and critical care authorizations and to have incentives to say this may be experimental, but we'll try it because we want our provider to get the experience to be able to participate in a trial, or we'll try it because it's cheaper, and if it works out, it's better economics for us. I see my time is up. Good morning. Abby Wright on behalf of the United States. I'm planning to use 10 minutes of time, and then counsel for HAP is planning to use 5 minutes of time. Plaintiff claims here that a private insurance company is liable in tort for its decision to agree ahead of time to pay for a medical procedure. Setting aside that plaintiffs can point to no case law supporting a tort liability in any event, the United States played no role in that preauthorization or the underlying medical determination. As the district court correctly held, HAP here was a contractor of the United States. The Part C Medicare Advantage organizations operate as contractors of the United States, not as their agents or employees. The United States pays a monthly payment for each enrollee. The Part C Medicare Advantage organization is operated like an insurance plan offering through your employer or the individual market. They put together a package of benefits. They make benefits determinations. The enrollee selects that program because they want to get all their Medicare in one package and have the advantages that one package offers. I'm happy to answer. Is there case law on Part A and Part B providers? Not in the FTCA context, Your Honor. There is case law from this court and others under 405H, determining whether claims need to be presented through the Medicare Act. In the first instance, there was a case in 2013 that Judge McKeague, Your Honor, wrote, Southern Rehabilitation Hospital, that held that claims against the fiscal intermediaries were also barred by 405H. But the language of the FTCA is different, and we're talking about a waiver of sovereign immunity. So I think we really need to focus on the language of the FTCA, which expressly carves out contractors, and then the body of law that's arisen after Orleans and Logue and the courts of appeals on this issue. Is sovereign immunity under the FTCA, is that a jurisdictional question? We believe that it is, Your Honor. This court has held in other sovereign immunity contexts that that's a jurisdictional question. But are we wrong? In other words, the Seventh Circuit has said the opposite. And I'm wondering, and I know I have written an opinion saying it was jurisdictional, so I'm speaking for myself as well. The issue, not that precise issue, but the issue of whether the statute of limitations is jurisdictional, is before the Supreme Court this term. We do think that the question of the waiver of sovereign immunity is jurisdictional, especially in the 1346 context, because the language of 1346 says it's a grant of exclusive jurisdiction to the district courts to hear claims against employees of the government. And so in construing that grant of subject matter jurisdiction to the district courts, you've got to figure out who an employee of the government is. So we do think it's jurisdictional. Is it possibly part of the problem in our loose language in some of these opinions, not, of course, Judge Morris, but others, obviously we have the jurisdiction, it seems to me it's obvious, we have jurisdiction to determine whether you can proceed under the Federal Tort Claims Act, that threshold question. That's right. Whether there is a cause of action because it's barred by the discretionary function exemption or exhaustion or whatever it is, that's a different question. But it seems to me we conflate those and we lump them in together. I think that's right. I think it usually doesn't matter because it only really comes up if you're asking questions about equitable tolling or you're asking questions about waiver. And so most of the cases where I think courts have not really bothered with the question is because it doesn't really matter. In the district court, you know, it might be a difference between 12b1 and 12b6, but for all practical purposes, you know, that's not going to win or lose the case. So I think that's why courts, it's an interesting doctrinal question. There are a lot of articles written on it. The government's position is that it is jurisdictional. And that's the government's position across the board. In other words, the Solicitor General would take that position in a case in the Supreme Court. If, you know, we had this specific issue, is it jurisdictional or not? In this case, the Solicitor General would take the position you're taking that it is jurisdictional? Well, I can tell you the Solicitor General has recently filed petitions for CERT on the statute of limitations question saying that that was jurisdictional. I would think if that's jurisdictional, it's a good argument for this. The Solicitor General has, there's not been a Supreme Court case where that has been the issue. So I can't say what the Solicitor General, you know, would exactly say in that. But I can say that in the CERT petitions filed over the summer or in the spring, that was the position that we took. But your argument here, I thought, in the briefs, which you haven't mentioned this morning, is that they didn't, they failed to plead a direct cause of action against the United States. You're here defending the United States. I am. So if we lose on the agent independent contractor, we're on the, we would be on the hook. I mean, if you get through the other problems. In theory, we could be on hook for what HAP did. If I carry it back. Well, that's going to be my next question. Because obviously the government, I assume, has an interest in what we hold with respect to HAP. Because were we to find that HAP could be sued under the Federal Drug Claims Act, that's clearly going to affect, I would assume, the financial dynamics between the government and these HAPs, right? I mean, I want to be clear that we think there are a number of steps before we would get to liability, even if you were to disagree with us on the agent independent contractor question. But were we to get all the way down the road, the United States is the party in interest under the FTCA. So, yes, we very much have an interest in that question. And then on the direct negligence claim. Because if we were to find that they could sue the Health Allegiance Plan under the Federal Tort Claims Act, would you then step in in the place of HAP under the Westfall Act? You would be holding that they were employees of the government. So, yeah. So that's why we have a very, obviously, a very strong interest. So you're it. In the final analysis, you're it. Yeah, we're it. But we're not it because there's no liability. You would be it. We would be it, but we're not. Possibly it. Possibly it. For the direct negligence claims, I think, as we said in our brief, I mean, they were waived. The magistrate judge said very clearly in the report, you've got to raise everything you've got now or you've waived those for appeal. And Mr. Zanetti was represented by counsel at that point. And the objections that were filed focused solely on that first issue, the vicarious liability agent-contractor issue. So we think those are waived, and this court would not need to reach those questions. If there are no further questions, we ask that the district court be affirmed. Thank you. Thank you. Good morning, Your Honors. Barbara Rulo appearing on behalf of HAP. And, yes, this is the first time I stand here that if I lose, someone else pays, the government. HAP is an independent insurance company organized under the laws of the state of Michigan, doing business in the state of Michigan, who entered into a contract with the Center for Medicaid Services to provide Medicare Advantage organization program. It is not Medicare Part A and B. It is the other animal, Part C. Part C is a program adopted by Congress, authorizing CMS to go out there and contract with private insurance companies to see if we can organize a better way of delivering Medicare services. People opt into this program. People renew the program. People pay a premium to the program. They pay it to HAP. HAP is an independent contractor. HAP has a contract with the government, and let's hope they do, because you wouldn't want tax dollars going out the door with no contract. But this contract is pretty clear. It says that the government cannot tell HAP who to do business with. It can't tell them to hire a doctor. It can't tell them to make a hospital part of its participants. It can't tell them to provide certain nursing home coverages. HAP gets to do that on its own. So did the government participate in deciding that this particular procedure would be used on Mr. Zinnecke? No, Your Honor. HAP is an insurance company. This is a little peculiar because this gentleman went out of network for an emergency. He went to St. Joseph Hospital as opposed to the HAP entities. But in the course of doing business, they called and said they're going to do a stenting procedure. It was approved, apparently, by HAP, but there was no communication with the government. The stenting procedure unfortunately resulted in Mr. Zinnecke's demise. It's unfortunate. So are there any medical questions, coverage questions, or procedural questions where HAP ever contacts the government, which I assume would be CMS, to get their approval or acquiescence in anything HAP does? No, Your Honor. HAP is bonded, insured, and is on the risk itself. It has to be by contract. It has to make sure it's financially stable and bears all of the risk of the enterprise. So, no, it is required to give Medicare benefits because that's what it's contracted to do. But in addition to those benefits, it can give eyeglass coverage or things that other insurers might not because it's competing for business in the marketplace. Sir, did you have a question? With HAP and other insurance companies, you get a call from the medical people and say we want to do a stent procedure on Mr. Zinnecke or whatever. That decision is made by some underwriter or somebody at your company? Correct, Your Honor. We don't convene the College of Cardiologists to say, and I'm not trying to be facetious, but this is an insurance company decision. Now, I'm not saying that there wouldn't be a cardiologist that they could refer to if they wanted to in the course of their business model. The question is asked of you, if we do this procedure at St. Joseph's or wherever, or University of Michigan Hospital, wherever we're going to do it, will you cover it? Correct. I mean, that's the question that's posed to you. That is the question, and they answer yes or no, and someone can challenge the yes or the no. Here you answered yes. And here the answer was yes. Now, I don't know if they were informed precisely as to the details of the stenting procedure, but they approved a stenting procedure. Okay. And that's what happened. Okay? And HAP pays for the care out of the precapitated amount it gets from the government each month. Some procedure then, if you cover the procedure, then somehow there's some billing to get the federal funds to reimburse you. No, Your Honor. What we get every month is you have members in your agency. This is an HMO model. You have members, and the government pays you X amount of money per month for the members, and you spend it however you want. And it can't tell you who to contract with and who to – and what amount you can – it can't tell you you have to contract for a certain price either. HAP is the one who negotiates its own deals. Okay. Any other questions? So could HAP decide – it's getting a certain amount of money from the government. Could HAP decide that it's going to spend a whole lot of money on one particular patient who has a dreadful problem and then deny coverage to other patients because there's no money left in HAP? No, Your Honor. The contract between the government and HAP is for HAP to provide the Medicare benefits to a group of people. The contract between whoever elects this kind of coverage and HAP says you're going to get these benefits. If HAP runs out of money, oh, well, they made a bad business decision. They're on the hook for it themselves. They have to, like Blue Cross has to say, you know, just because John gets a tonsillectomy, Pete doesn't get one because we're out of money. No. You have to perform according to your contract with your consumer, and then you have a contract with the government who's giving you a set amount of money every month. But the government doesn't tell you who you have to provide with. So you try to negotiate contracts with physicians and hospitals and nursing homes so that you get the best possible rate when you're paying, but the government cannot by statute and regulation tell you who to contract with or what price you have to pay. That's a business decision HAP makes. But there is government involvement in the sense that by entering into a contract with you folks to provide the benefits covered by Medicare, those Medicare benefits have been determined by the government. Correct. And you have to do it. We have to. We have to supply Medicare benefits. Now, even having said that, let's assume, I don't know what you call a stenting procedure, but some sort of cardiology procedure. Do the regulations say, for example, whether you get this stent or that stent? Do they get into that detail? Do you know? No. What Mr. Heron was referencing were national coverage determinations, which apparently made a determination that this Boston Scientific Wingspan Stent was not going to be a Medicare-covered benefit except in certain circumstances. This gentleman did get that stent, and HAP was billed for the stent. The hospital physicians were paid for their services. That is, I think, where he's saying is we gave more than Medicare required, and we should not have been allowed to do that. That's a state tort claim, Your Honor. Did HAP violate its contract with its own insured? I don't think it did, but that's not a federal question. It doesn't make HAP a federal contractor. We're beholden to all sorts of federal regulations. You can't operate an insurance company. You can't operate a hospital. You can't go into contracts with physicians and hospitals and nursing homes to provide benefits without complying with a lot of federal regulations. But it is clear that they've divided up the regulations under Medicaid services between those that are applicable to the fiscal intermediaries and those other ones that are applicable to managed care organizations. And the ones for managed care organizations say, hold off. It's an independent contractor relationship. In order to even be a managed care organization, you need to have a contract with the government, and the government can't tell you how to run your business. Your red light is on. Thank you. Thank you so much. Thank you. Thank you. National coverage determinations are an important part of the total realm of benefits the Secretary has determined to provide to Medicare participants. And benefit determinations ultimately are the Secretary's determination. To repeatedly say the government can't tell us what to do, well, there are some things, counsel is correct, the government doesn't involve itself in, which doctors you contract with. But the government tells its citizens that if you participate in this program, you're going to get certain benefits. There is a floor. You're going to get this and this and this and this covered. And we're also going to tell those people who are providing health care under Medicare, there are some things you can't do. There are some things that aren't covered or that you can only use in certain circumstances. And that's what we're talking about here. HAP acknowledges that they approve this procedure. The documents in the record indicate they didn't go through the information system that screens this stuff. To say that we are going to provide an experimental procedure without informed consent in violation of the national coverage determinations, and to say that was an extra benefit provided under the contract, it seems cynical to me. But would you be able to sue under the Federal Tort Claims Act if it were not an experimental procedure? If it were a procedure outside a national coverage determination. But suppose it's an appendectomy that goes bad. Would you be able to, and everybody knows you do appendectomies if you have appendicitis and it's not going to cure itself. So an appendectomy is an approved procedure, but it goes bad. And would there be a Federal Tort Claims Act under that hypothetical? A Federal Tort Claims Act claim. I think your hypothetical shows an absence of any negligent by the government or its employee, HAP in this case, because obviously routine decisions are approved on a daily basis. And I don't think every routine health care decision necessarily elevates to a Federal Tort Claims Act. It is in the supervision, it is in the contractual relationship under Part C where these determinations are being made in advance of care. But the claim could be filed. There would be jurisdiction under the Federal Tort Claims Act. You're saying it's just that it wouldn't be a winning claim. Is that right? Am I putting words in your mouth improperly? I believe that is a correct analysis. Under that hypothetical, jurisdiction would lie, and it would be a jurisdictional question. We're going to just dance past that. The statute has an incredible disincentive for frivolous claims, and that has to do with the limitations on fees paid to attorneys for plaintiffs under that claim. There's not only a cap on the fees, but you can't collect until you win. I don't think the court needs to worry that a ruling in this case with experimental procedures is going to lead to a flood of lawyers thinking these are cases we want to bring. I'm kind of back to where I was at the very beginning. We're not talking about whether you can sue HAP. Presumably you have. Maybe you won, maybe you lost. I don't know. We're talking about whether you can also sue the government by claiming that HAP is a government employee. And you just said a moment ago that that arises out of the government's supervision or direction to HAP. So where was there any supervision in connection with this particular procedure? Was there any? We do not assert that the government has agents on site at every HMO engaged in day-to-day, yes or no, second-guessing of coverage determinations. The government's involvement was in the national coverage determination. You're going to contract with us. You're going to provide this benefit to our citizens.  So no HAP can then exceed whatever Part A and Part B cover without then triggering government liability for their decision, if you take this to its logical conclusion? Not necessarily. The eyeglass example that counsel offered, of course, that's a benefit. It's an additional benefit. You can provide it. It might incent people to use you as their Medicare provider. But what you can't do are those things which the government has said one should not do or should only do under limited circumstances. It's not that it's an additional benefit. There may very well be additional benefits that are appropriate and fine and do not give rise to liability. But where the government has weighed in and says, do not use the Boston Scientific Wingspan stint and HMO violates that, then I think they are a stand-in in the place of the government. And it does rise to the level of employee. It is a trick. So by telling them not to do it and they do it, you say they're supervising them closely? Yes. Okay. And what I also say, and I just want to be clear if I can have another 15 seconds, is that we acknowledge the challenge that Logue read strictly as meaning day-to-day control is the sine qua non of whether or not one can be an employee of the government. And we are suggesting that the nature of this program, its breadth, its scope, and the nature of health care and health care delivery warrant an analysis beyond strictly whether or not there's day-to-day control. Thank you. Thank you all for your argument. The case will be submitted. Would the clerk call the next case, please?